

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

EVELYN J.D. SZYMANSKI,                )
                                      )
            Plaintiff,                )
                                      )
      v.                              )   No. 03 C 7573
                                      )
COUNTY OF COOK,                       )   Judge Rebecca R. Pallmeyer
                                      )
            Defendant.                )

## MEMORANDUM OPINION AND ORDER

On October 27, 2003, Plaintiff Evelyn Szymanski, a nurse practitioner, filed a two-count complaint alleging that her former employer, Defendant Cook County, retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e)-3(a) (Count I) and interfered with her prospective economic advantage (Count II). Both of these claims rest on Plaintiff's assertion that a County Hospital official "blacklisted" her by giving negative references to prospective employers, effectively preventing her from obtaining appropriate employment at various area hospitals. Both parties have moved for summary judgment. For the reasons set forth below, Defendant's motion is granted and Plaintiff's motion is denied.

## FACTUAL BACKGROUND

### Plaintiff's Tenure at Cook County and Earlier Litigation

Plaintiff, a registered nurse and licensed nurse practitioner, was hired by Cook County Hospital on January 3, 1983 and assigned to the Hospital's Adult Screening Unit in the Fantus Health Center. (Plaintiff's Local Rule 56.1(a) Statement, hereinafter "Pl.'s 56.1(a)," ¶ 4.) In January 2000, she filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that the Hospital discriminated against her on the bases of race and national origin by

denying overtime hours, excessively scrutinizing her work, and failing to provide her with business cards. (*Id.* ¶ 5.) *See Szymanski v. County of Cook*, No. 00 C 4737, 2002 WL 171977, at *3 (N.D. Ill. Feb. 1, 2002). Her subsequent federal lawsuit alleged, in addition, that managers retaliated against her for filing the charge by assigning her to clean patient education files. *Id.* at *7. On April 3, 2002, a jury returned a verdict in favor of Defendant on those claims. Just three weeks later, on April 23, 2002, Plaintiff was terminated by Cook County. She promptly filed another charge of retaliation. *See Szymanski v. County of Cook*, No. 01 C 9588, 2002 WL 31509780 (N.D. Ill. May 8, 2002) (denying summary judgment on Plaintiff's second retaliation suit).

At the time of Plaintiff's termination, Dr. John Raba was the medical director of Fantus Health Center. (Deposition of Dr. John Raba ("Raba Dep."), Exhibit 6 to Pl.'s 56.1(a), at 7.) At some point in early 2001, nurse practitioners in Cook County came under Dr. Raba's administrative control as a result of budget changes in the Department of Medicine. (*Id.* at 9.) Dr. Raba testified that Plaintiff was terminated from her position as nurse practitioner in April 2002 because she failed to enter into a "collaborative agreement" with a licensed physician, as required by an Illinois statute enacted in 2001. (*Id.* at 23; see also Deposition of Evelyn Szymanski, hereinafter "Szymanski Dep.," Ex. 1 to Defendant's Local Rule 56.1(a) Statement, hereinafter "Def.'s 56.1(a)," at 15.) Dr. Raba was responsible for record keeping with respect to collaborative agreements; he was the person who formally terminated Plaintiff, but testified that he was merely "follow[ing] the rules of the county" and that it was the county board that made hiring and firing decisions. (*Id.* at 11, 19.)

Plaintiff contends she did have a collaborative agreement at the time she was fired, with Dr. Glen Harrison, (Szymanski Dep., at 112, 114), and that Dr. Raba acted improperly in refusing to approve that agreement or in interfering with her efforts to secure a collaborative agreement with

other physicians. Judge Coar denied summary judgment on this claim, and it was tried to a jury in January 2003. This time, the jury returned a verdict in Plaintiff's favor. Judge Coar entered a judgment for a period of front pay in lieu of reinstatement; he reasoned that "given the history of distrust and strained relations between the Plaintiff and her supervisors at [Fantus Health], it is highly likely that reinstatement will result in future complaints about the implementation of and compliance with the order." *Szymanski v. County of Cook*, No. 01 C 9588, 2003 WL 259141, at *1 (N.D. Ill. Jan. 29, 2003). Judge Coar ordered, further, that Defendant "expunge any reference to plaintiff's suspension and termination from her personnel file, as well as reference to any other disciplinary action taken against her related to the issues in this case." (Szymanski Dep., Ex. 1 to Def.'s 56.1(a).)

Dr. Raba retired from his position as Director of the Clinic on October 1, 2003 but continues as a consultant for the County at Cermak Health Services. (Raba Dep., at 15.)

**Plaintiff's Subsequent Employment**

Some months after her termination, in September 2002, Plaintiff was hired to work as a staff nurse at Little Company of Mary Hospital. (Pl.'s 56.1(a) ¶13.) She remained employed there as of the date of her deposition on November 3, 2004. Plaintiff, who contends in this lawsuit that negative references have compromised her employment prospects, surmises, without any evidentiary foundation, that Little Company of Mary Hospital hired her without seeking any employment references because the hospital was "'desperate for help' and checked only to find out the dates of Plaintiff's previous employment and whether she had a criminal record." (Szymanski Dep., at 31.)

**Plaintiff's Claim of Negative References**

Plaintiff believes that from January 23, 2003 to the present she has been "blackballed" by Cook County from obtaining employment as a nurse practitioner. (Def.'s 56.1(a) ¶ 3.) Specifically, Plaintiff asserts that Dr. Raba intentionally advised prospective employers that she was responsible for initiating litigation against Cook County and falsely reported that she was terminated for cause. (Plaintiff's Motion for Summary Judgment, hereinafter "Pl.'s Motion," at 3.) As a result of these statements, Plaintiff contends, she was denied employment as a nurse practitioner at several institutions, including Advocate Hospitals, Cook County Hospitals, Northwestern University, Rush University, Loyola University, and The University of Chicago Hospitals, and through agencies that provide nurses on a contract basis, specifically Interim Healthcare and Integrated Health Solution. (Szymanski Dep., at 39.) Her efforts to find work, and the results of those efforts, are described below.

### 1. Advocate, Loyola, Northwestern, UIC

The circumstances relating to Plaintiff's applications at several institutions are similar and can be discussed briefly, as there is no evidence that Dr. Raba communicated with any of these institutions in connection with those applications. Advocate Health Center Group is a group of hospitals that includes Christ Medical Center, Good Shepherd, Illinois Masonic, and Dwyer. (Def.'s 56.1(a) ¶ 15.) In response to an on-line application, Plaintiff interviewed in July 2003 at Illinois Masonic Hospital for a position at any of the hospitals under the Advocate umbrella. (Szymanski Dep., at 45; Def.'s 56.1(a) ¶ 16.) Plaintiff provided Dr. Raba's name as an employment reference and signed a waiver permitting Advocate officials to contact him. (Def.'s 56.1(a) ¶ 17.) After her initial interview, Plaintiff testified, Illinois Masonic failed to return her calls. (Szymanski Dep., at 49.)

Plaintiff applied on-line to Good Shepherd Hospital and submitted applications to the other hospitals within the Advocate Health Center Group, as well, (*id.* at 52), but was not hired by any of them. (Szymanski Dep., at 76.) She has no independent knowledge, however, that Advocate contacted Cook County, that Cook County received the release that she signed, or that Cook County sent a referral on her behalf to any of the Advocate hospitals. (*Id.* at 77-78; Def.'s 56.1(a) ¶¶ 22-23.)

Plaintiff applied with Loyola University Hospital ("Loyola"), (Def.'s 56.1(a) ¶ 26), Northwestern University Hospital ("Northwestern"), (*id.* ¶ 32), and University of Illinois at Chicago Hospital ("UIC"), (*id.* ¶ 39) for a position as a nurse practitioner in 2002, 2003, and 2004; the specific dates of these applications are not in the record, nor is there any evidence that there were openings for such positions at the time Plaintiff applied. Plaintiff authorized all three hospitals to contact Cook County for employment references. (*Id.* ¶¶ 26-27, 33-34, 39-40.) None of the three hospitals invited her for interviews. Plaintiff does not know whether officials at the three hospitals contacted Cook County Hospital or what information, if any, they received. (*Id.* ¶¶ 29-30, 33-37, 43-44.)

### 2. Interim Healthcare

On August 19, 2002, Plaintiff applied for employment with Interim Healthcare, (Pl.'s 56.1(a) ¶ 15), an agency that provides contract nurse practitioners and staff nurses to hospitals and clinics. (Szymanski Dep., at 171.) Plaintiff signed a waiver to allow Interim Healthcare to contact Dr. Raba as an employment reference, (Szymanski Dep., Ex. 14), and Dr. Raba did complete the employment reference form, which called for assessments in the categories "Job Knowledge, Quality, Quantity, Attitude, Dependability, Punctuality." (*Id.*) On a scale of "Excellent," "Good," "Fair," and "Poor," Dr. Raba checked "Good" or "Fair" for all the categories. (*Id.*) In the "Reason for Leaving," portion

5

of the reference, Dr. Raba wrote, "administrative change in minimum job requirements." (*Id.*) Plaintiff testified that Interim agreed to provide her with hospital placements in August 2002 but that she received no work assignments from Interim Healthcare subsequent to Dr. Raba's August 26, 2002 employment reference. (*Id.* at 172-73, Ex. 14.)

### 3. Integrated Health Solutions

Integrated Health Solutions ("Integrated") is, like Interim, a nursing agency that provides nurses to hospitals in the Chicago area. (Deposition of Julie Campagna, hereinafter "Campagna Dep.," Ex. 8 to Pl.'s 56.1(a), at 55.) Integrated is owned and operated by Lorrie Dohrman, and has offices in Chicago and Arizona. (*Id.* at 7-10.) Dohrman oversees all operations of Integrated, including but not limited to the final approval of nurses and the scheduling of nurses at hospitals in Chicago. (Deposition of Lorrie Dohrman, hereinafter "Dohrman Dep.," Ex. 9 to Pl.'s 56.1(a), at 8.) Julie Campagna is the sole nurse recruiter for Integrated. (Campagna Dep., at 7.) Campagna testified that she recruits and hires five to eight nurses each week and then sends their personnel files to Arizona; her involvement in the nurses' employment ends there. (*Id.* at 8, 41-42.) The initial application includes a list of hospitals for which Integrated provides nurses. The nurse applicant circles those hospitals she is willing to work for and Campagna sends the form, along with the rest of the application, to the staffing department in Arizona. (Campagna Dep., Integrated Company Policy, Ex. 13.) The individual nurse is expected then to advise the staffing department in the Arizona office of her available hours, and staff in Arizona make contact with Integrated's client hospitals to arrange scheduling.

Integrated's hiring process requires review of three personal references, a drug test, and a criminal background check, and completion of a written medical exam. (*Id.* at 11-12.) If the

references, drug test, and criminal background check (a process that takes four to five days) are satisfactory, and the employee passes the written medical exam, the employee is accepted for placement and recorded as hired as of the date of the initial interview. (*Id.* at 11, 18.) Integrated issues an employee identification card to the applicant at the initial interview; if the subsequent background check reveals a disqualifying factor, Integrated takes action to void the card so that the individual cannot access Integrated's facilities or any hospitals. (*Id.* at 19.)

Plaintiff completed an application with Integrated on February 24, 2003 at the Schaumburg office, (Pl.'s 56.1(a) ¶ 17), listing Dr. Raba as her employment reference at Cook County. (Def.'s 56.1(a) ¶ 65.) Plaintiff testified in her deposition that she initially left the "reason for leaving" section of her application blank, (Szymanski Dep., at 177), but that Campagna insisted she complete the form, warning her: "You have to tell the truth because if we find -- your past employer tells us something different than what we get, then we won't even consider you for employment." (*Id.*) Thus pressed, Plaintiff testified, she entered the words "terminated because of national origin" on the form.[1] (*Id.*) Campagna denied having directed Plaintiff to make a change in the application. (Campagna Dep., at 26-27.) According to Campagna, Plaintiff advised her that she was suing Cook County, but Campagna assured Plaintiff that Integrated "didn't care about things like that." (*Id.* at 25-26.)

Soon after Plaintiff's initial interview, Campagna contacted Dr. Raba and, as reflected in the Employment Reference form Campagna completed, Dr. Raba provided a "very good reference." (Campagna Dep., at 74.) Campagna did not ask Dr. Raba to explain why Plaintiff was terminated

---

[1]     The court notes that Plaintiff prevailed against Cook County at trial, on January 29, 2003, on a retaliation claim, not a claim of national origin discrimination.

from Cook County, instead seeking only that information called for in Integrated's reference form, concerning "attendance, appearance at work, initiative, nursing skills, quality of work, flexibility, cooperation and attitude, . . . traina[bility], and adap[tation to] new situations." (*Id.* at 31-32; Campagna Dep. Ex. 8.) As noted above, on a scale of "Excellent," "Good," "Fair," and "Poor," Dr. Raba evaluated Plaintiff as "Good" in all categories. (*Id.*) In the "Strong Traits" portion of the application, Dr. Raba noted that Plaintiff "works well with others and is meticulous and reliable." (*Id.*) In the "Weak Traits" portion of the application, Dr. Raba provided the answer, "CPR Crash Carts." (*Id.*) Plaintiff is suspicious of this answer because she never worked with CPR crash carts while she was employed at Cook County (Szymanski Dep., at 169); the court observes that an employee may well be deemed deficient in a skill in which she has no experience. In any event, Campagna testified that Dr. Raba's comment regarding the CPR crash carts was "not a big thing," and that Plaintiff's evaluation was "very good." (Campagna Dep., at 74.) In response to the question whether he would "trust [Szymanski] to take care of a family member" of his own, Dr. Raba responded, "Yes as nurse." (Campagna Dep., Ex. 8.) Plaintiff believes this is a negative reference, because she is a nurse practitioner, not a nurse. (Szymanski Dep., at 170.) Campagna testified, however, that Plaintiff's "references checked out fine," that "she wouldn't have been hired if they didn't," and that Dr. Raba's recommendations were instrumental in that assessment. (Campagna Dep., at 24, 74.)

Plaintiff did not receive any employment placements from Integrated, however. (Pl. 56.1(a) ¶ 21.) She claims to have telephoned Integrated "daily" for work assignments,[2] (Szymanski Dep.,

---

[2]     The court is puzzled that Plaintiff, who is employed full time as a nurse at Little
(continued...)

at 162), but was not placed in any hospitals that she requested. (Pl. 56.1(a) ¶ 21.) According to Lorrie Dohrman, Integrated's CEO, Plaintiff called Integrated only once between February 24, 2003 and October 21, 2004 and identified only four dates on which she was available for work. (Dohrman Dep., at 59.) Dohrman explained that Integrated's computer records of nurse calls reflect that Plaintiff was available for just four days. (Dohrman Dep., at 26, Ex. 12.) Dohrman is certain that Plaintiff did not call on any other occasion or provide other dates because "it would either be in the pending screen or the history screen, and you cannot delete them." (Dohrman Dep., at 29-30.) Although Plaintiff claims to believe that Integrated "revoked" her hiring, she admitted that she was never so notified by any Integrated personnel. (Szymanski Dep., at 163, 164.) Campagna herself testified that Plaintiff still remains eligible and that "all she has to do is update her file and give hours." (Campagna Dep., at 77.)

### 4. Hunter Enterprises

Concerned about the possibility that Dr. Raba's references were jeopardizing her employment prospects, on February 23, 2003, Plaintiff retained the services of Hunter Enterprises, (Def.'s 56.1(a) ¶ 54, Ex. 15, Cancelled Check from Szymanski to Hunter Enterprises), a firm in the business of confirming employment references made to prospective employers. (Pl.'s 56.1(a) ¶ 25.) Plaintiff authorized Hunter Enterprises to contact Dr. Raba to verify her employment reference. (Def.'s 56.1(a) ¶ 54; Cerna Affidavit, Szymanski Dep., Ex. 7, ¶ 3; Szymanski Dep., Ex. 8.) On May 1, 2003, Maria Cerna, the Vice President of Hunter Enterprises, contacted Dr. Raba. (Pl.'s 56.1(a) ¶ 26;

---

[2](...continued)
Company of Mary Hospital, nevertheless claims to have called Integrated "daily" for additional work assignments.

Cerna Affidavit, Szymanski Dep., Ex. 7.) Cerna completed a standard reference form during her conversation with Dr. Raba and forwarded a copy of that form to Plaintiff. (Cerna Affidavit; Szymanski Dep., Ex. 10.) Cerna did not furnish the form to any prospective employer, however, (Def. 56.1(a) ¶ 59, and Plaintiff acknowledges that there is no evidence that any employer refused to hire her because of information provided by Hunter Resources. (Pl.'s Dep., at 129.)

As reflected in the form, Dr. Raba told Cerna that "Illinois has a state law . . . [requiring] a collaborative [agreement]," that Plaintiff was unable to obtain such an agreement, and was dismissed because "she didn't meet our minimum requirements." (Cerna Affidavit; Szymanski Dep., Ex. 10.) Dr. Raba noted that while there were no negative assessments of her clinical duties or quality of work, it was difficult for Plaintiff to obtain a collaborative agreement because of her personality and communication skills. (Cerna Affidavit; Szymanski Dep., Ex. 10.) In the "interviewer's notes" portion of the reference form, Cerna noted that "Dr. Raba, without prompting, readily discussed [Plaintiff's] termination, emphasizing that the decision was based on a 'lack of collaborative providers' and not due to her skills and knowledge. He also noted . . . the pending 'legal action' she and others have taken to have their jobs reinstated."[3] (Id.) Dr. Raba added that there was "some litigation regarding [Plaintiff's] loss of employment and that unless someone [was] willing to sign for her," she would not be hired again. (Id.) In his deposition, Dr. Raba acknowledged that his reference to "litigation" was a reference to the case tried on January 23, 2003, in which Plaintiff won a jury verdict in her favor. (Raba Dep., at 49.) Dr. Raba testified, further, that at the time of Cerna's

---

[3]       Judge Coar, in a previous opinion, noted that besides Szymanski, "two other Nurse Practitioners have been suspended and/or terminated for not having a collaborative agreement." *Szymanski*, 2002 WL 31509780, at *5.

call, he was unaware of the court order directing Cook County to expunge references to Plaintiff's EEOC litigation from her personnel file, (Raba Dep., at 38), and that he would not have made any statements regarding Plaintiff's termination and litigation had he been aware of the court order. (Id. at 54.)

### 5. University of Chicago

Plaintiff contacted Cynthia St. Aubin, the nurse recruiter for the University of Chicago Hospital System ("University of Chicago"), at a job fair on April 2, 2003 and gave St. Aubin a copy of her resume.[4] (Pl.'s 56.1(a) ¶ 22.) Plaintiff testified that St. Aubin told her she would check Plaintiff's references and directed Plaintiff to call back the following week. (Id.; Szymanski Dep., at 134.) Plaintiff claims that when she telephoned St. Aubin the following week, St. Aubin advised her that she had contacted Dr. Raba and that Dr. Raba reported that Plaintiff had been fired for misconduct. (Pl.'s 56.1(a) ¶ 23; Szymanski Dep., at 132.) According to Plaintiff, St. Aubin stated, "We cannot consider you for any type of employment because you were discharged for misconduct." (Szymanski Dep., at 132.)

St. Aubin testified at her deposition that she did not recall any telephone conversations with Plaintiff and that she never communicated with anyone at Cook County Hospital regarding Plaintiff. (Def.'s 56.1(a) ¶ 49; Deposition of Cynthia St. Aubin, hereinafter "St. Aubin Dep.," Ex. 7 to Pl.'s 56.1(a), at 49-50, 60, 64.) Though he acknowledged it was possible, Dr. Raba also did not recall any conversation with a recruiter from the University of Chicago. (Raba Dep., at 12.) There is, thus,

---

[4] Documents produced in discovery by the University of Chicago show that the University of Chicago received a resume from Plaintiff on February 20, 2003 and a second resume on April 14, 2003, presumably at the April 2003 job fair.

no non-hearsay testimony that such a conversation took place (regardless what she may have told Plaintiff, St. Aubin's alleged statement that she spoke to Dr. Raba is not admissible for its truth).

Plaintiff testified that St. Aubin told her she was qualified to work at the University of Chicago and that there were vacancies for the position of Nurse Practitioner at the time of her application. (Pl.'s 56.1(a) ¶ 24.) St. Aubin testified that she forwarded Plaintiff's resume to Leslie Fulton (apparently another member of the University of Chicago Hospital staff). (St. Aubin Dep., at 37.) St. Aubin testified that she does not check employment references until an offer is extended to the employee (*id.* at 36); because Leslie Fulton (presumably the person who would have made the offer) did not contact St. Aubin after receiving Plaintiff's application, St. Aubin testified she did not check Plaintiff's references. (*Id.* at 39.)

Plaintiff concluded that the University of Chicago's failure to hire her was itself the product of discrimination. In an on-line application to the University of Chicago Hospitals Job Postings website, Plaintiff filled out the "Comments to the Recruiter or cover letter" portion of the application with: "Since I have been barred from attaining employment [despite my] education and experience .... I believe that you do discriminate [sic] national origin and protected EEOC activity."[5] (Def.'s 56.1(a), Ex. 10.) Similarly, in another on-line application on October 7, 2003, Plaintiff filled out the "Comments to the Recruiter or cover letter" portion of the application with: "It is pretty obvious I am blackballed from employment. To date have applied for 22 jobs since Feb. 2003 and denied an interview because as stated to me by phone 'you have been terminated for cause from your previous

---

[5]     The exhibit is undated. November 20, 2003 is the date that appears at the bottom of the document but it is unclear whether that is the date of the application or the date that the document was printed out.

employer.'" (St. Aubin Dep., Ex. 8.) In addition, on October 9, 2003, Plaintiff filed an EEOC charge against University of Chicago in which she asserted, "I applied for twenty four nurse positions with the [University of Chicago] starting in February 2003. I have filed ten prior charges of discrimination against my former employer. In April 2003, Respondent's nurse recruiter told me that I will not be hired because I have filed prior charges of discrimination against my employer." (Def. 56.1(a), Ex. 11.)

The University of Chicago's legal counsel was unaware of those charges until July 28, 2004, the date Ms. St. Aubin was deposed in this case. When she saw a copy of Plaintiff's October 2003 charge during the course of the deposition, University counsel expressed her belief that the deposition ought not continue if the Plaintiff and the University are "adversaries," and then instructed Ms. St. Aubin not to answer questions concerning the reasons for the University's failure to hire Plaintiff. (St. Aubin Dep., at 16, 43.) Without commenting on the propriety of University counsel's position, the court notes that Plaintiff made no motion to compel further discovery. The court notes, further, that Ms. St. Aubin testified that she had no recollection of ever speaking with Plaintiff. (*Id.* at 48.) And she testified unequivocally that she never "advise[d] [Plaintiff] that she had been fired or terminated from a prior position of employment for cause or for misconduct," (*id.* at 50), and that she did not contact Cook County, or any of Plaintiff's previous employers, in connection with Plaintiff's application for work. (*Id.* at 64.)

## DISCUSSION

Both parties seek summary judgment on Plaintiff's retaliation claim. Defendant has moved for summary judgment on Plaintiff's tortious interference claim, as well. Summary judgment is proper where the "pleadings, depositions, answers to the interrogatories, and admissions on file, together

13

with the affidavits, demonstrate that there is no issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To make that determination, the court views all facts, and draws all reasonable inferences, in the light most favorable to the nonmoving party. *Id.* at 255. On cross-motions for summary judgment, this court considers the merits of each cross-motion separately and draws all reasonable inferences against the party whose motion is under consideration. *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001).

I.      Title VII Retaliation Claim

Plaintiff argues that her former employer, Cook County, "blackballed" or "blacklisted" her from obtaining employment as a nurse or nurse practitioner at numerous hospitals in the Chicago area by explicitly mentioning her EEOC litigation against Cook County and providing negative references to Plaintiff's potential employers. (Plaintiff's Memorandum of Law in Support of Motion for Summary Judgment, hereinafter "Plaintiff's Brief," at 2.) In 1996, the Seventh Circuit recognized that post-termination events are actionable under Title VII. *See Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881 (7th Cir. 1996); *Ruedlinger v. Jarrett*, 106 F.3d 212, 214 (7th Cir. 1997). The following year, the U.S. Supreme Court upheld an expansive reading of the term "employee" in the statute, finding that former employees are protected from retaliatory actions by their former employers under the anti-retaliation provisions of Title VII. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). In both *Robinson* and *Veprinsky*, plaintiffs alleged that, in retaliation for the filing of EEOC charges, their former employers had provided negative references to potential employers. *Robinson*, 519 U.S. at

14

339-40; *Veprinsky*, 87 F.3d at 894. In *Veprinsky*, the court concluded that "the ability to 'blacklist' a former employee, and thus foreclose future employment possibilities is but one example of an employer's power to punish a former employee for exercise of her Title VII rights." 87 F.3d at 890.

As explained in *Stone v. City of Indianapolis*, 281 F.3d 640, 644 (7th Cir. 2002), a plaintiff can make out a case of retaliation either by the "direct method" or the "indirect method." *See also Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003); *Hudson v. Chicago Transit Authority*, 375 F.3d 552 (7th Cir. 2004); *Mannie v. Potter*, 394 F.3d 977, 984 (7th Cir. 2005). In light of the Court's holding in *Veprinsky* that post-termination retaliation is actionable under the anti-retaliation provisions of Title VII, it follows that post-termination retaliation would follow the same framework that the Seventh Circuit has established for retaliation cases in general. *Veprinsky*, 87 F.3d at 890.

Unfortunately, neither party here has directly addressed that framework. Plaintiff does not explain whether she is proceeding under the direct or indirect method, (Pl.'s Brief, at 6); Defendant makes reference to the *McDonnell Douglas* framework but proceeds under an adaptation of that framework that has been discarded by the Seventh Circuit. (Defendant's Memorandum of Law in Support of Motion for Summary Judgment, hereinafter, "Def.'s Brief," at 6 (citing *Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1038 (7th Cir. 1998) for the proposition that Plaintiff must establish a "causal link," a requirement eliminated in *Stone*). Plaintiff appears to believe that Defendant's failure to expunge her personnel file and delete references to the circumstances leading to her suspension and termination in April 2002 is sufficient, by itself, to establish retaliation. (Pl.'s Brief, at 6.) In the court's view, Defendant's apparent violation of Judge Coar's order is a matter that should be brought before that judge, and may constitute evidence of an adverse action for the purpose of a *prima facie* case here. It is not sufficient alone, however, to establish retaliation.

15

Instead, to establish retaliation by the "direct method," Plaintiff must present either direct or circumstantial evidence of that offense. Direct evidence proves the fact in question "without reliance on inference or presumption" and "essentially requires an admission by the decision-maker that his actions were based upon prohibited animus." *Rogers*, 320 F.3d at 753 (citing *Walker v. Glickman*, 241 F.3d 884, 888 (7th Cir. 2001)). Plaintiff presents no direct evidence that Dr. Raba, or any other Cook County officials, gave negative references to potential employers because Plaintiff engaged in the protected activity of filing EEOC charges. *Cf. Rogers*, 320 F.3d at 754 (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000)). Nor is the circumstantial evidence sufficient here to establish a case under the direct method. Circumstantial evidence allows a jury to infer intentional discrimination by the decision maker, *Rogers*, 320 F.3d at 754 (citing *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)), where there is evidence that Plaintiff "engaged in protected activity (filing a charge of discrimination) and as a result suffered the adverse employment action of which [she] complains." *Stone*, 281 F.3d at 644. It is undisputed here that Plaintiff has engaged in protected activity by filing EEOC charges of discrimination against Cook County. (Pl.'s Complaint, Ex. A.) What is less clear is whether Plaintiff can show she suffered an adverse employment action. Plaintiff urges that Dr. Raba provided negative references to prospective employers, placement agencies, and nurse recruiters by "misrepresenting plaintiff's work record at every opportunity." (Pl.'s Brief, at 7.) Defendant argues that there is no evidence that Dr. Raba, or anyone else at Cook County, provided information about Plaintiff's termination, subsequent lawsuit, or job performance to any of Plaintiff's potential employers. (Def.'s Brief, at 6.)

The court agrees. Plaintiff's case hinges on the alleged negative references that St. Aubin, the nurse recruiter for the University of Chicago, received from Dr. Raba. According to Plaintiff,

16

St. Aubin advised her that the University of Chicago could not consider her for any position because she had been fired for misconduct. (Pl.'s Brief, at 9; Szymanski Dep., at 132.) St. Aubin, however, denies having communicated with anyone associated with Cook County regarding Plaintiff or advising Plaintiff that she was aware that Plaintiff had been terminated from Cook County. (St. Aubin Dep., at 64.) Because Plaintiff has offered St. Aubin's statement for its truth – that is, to show that St. Aubin did receive a negative employment reference from Dr. Raba – it constitutes hearsay. St. Aubin's alleged statement that Plaintiff was fired for misconduct is obviously not offered for its truth; but without evidence that Dr. Raba was the source of that alleged misinformation, there is no rational basis on which a jury could conclude that Cook County retaliated against her.

Nor is there any evidence that Plaintiff suffered adverse employment action at Interim, Integrated, or Hunter Enterprises.[6] The evidence shows that Dr. Raba advised representatives of Interim Health Care that Plaintiff was released from Cook County due to "administrative change in minimum requirements." (Szymanski Dep., Interim Employment Reference Form, Ex. 14.) Plaintiff characterizes this explanation as "not only false, [but] summarily rejected by the jury as mere pretext for retaliation," in the trial on January 29, 2003. (Pl.'s Brief, at 8.) The jury may well have refused to accept Dr. Raba's legitimate, non-discriminatory reason for Plaintiff's termination; his reporting this legitimate reason to a potential employer does not constitute retaliation, however.

With respect to Integrated, Plaintiff testified that when she initially declined to complete the "reason for leaving" portion of her application, Campagna insisted that she do so, warning her that

---

[6] Defendant correctly notes that there is no evidence that Plaintiff suffered any adverse employment action with respect to Advocate Hospitals, Cook County, Loyola, Northwestern, and UIC. Indeed, Plaintiff makes no mention of these hospitals in her submissions on summary judgment.

"You have to tell the truth because if we find --- your past employer tells us something different than what we get, then we won't even consider you for employment." (Szymanski Dep., at 177.) In response to this direction, Plaintiff testified that she reported having been "terminated because of national origin." (Id.) As noted earlier, Plaintiff prevailed at trial on the basis that Cook County retaliated against her for filing EEOC charges, not that she suffered national origin discrimination. In any event, information that Plaintiff herself furnished to potential employers does not constitute retaliation.

Notably, Campagna denied requiring Plaintiff to make any changes in her application and the standard form that Campagna fills out when she contacts previous employers for references regarding potential nurses reflects a favorable recommendation for Plaintiff. (Def.'s 56.1(a) ¶ 19; Campagna Dep., at 26-27; Campagna Dep., Ex. 8.) According to Campagna, Plaintiff remains eligible for placement through Integrated, and "all she has to do is update her file and give hours." (Campagna Dep., at 77.)

Plaintiff emphasizes two comments on the reference form that she believes could be construed as negative by a reasonable jury, but the court is not persuaded. First, the portion of the form where the recruiter is expected to list "weaknesses," includes the words "CPR crash carts." Plaintiff notes that she never used CPR crash carts at all while employed at Cook County (Szymanski Dep., at 169), but in the court's view, her lack of such experience might fairly be viewed as a weakness. Campagna testified that Dr. Raba's reference to CPR crash carts was "not a big thing," and that his evaluation was "very good." (Campagna Dep., at 74.) Nor is the court troubled by the qualification Dr. Raba included in his response to the question, "Would you trust RN to take care of a family member of yours?" Dr. Raba replied, "yes as nurse." (Campagna Dep., Ex. 8.) Dr. Raba's position is that he

18

could not employ Plaintiff as a nurse practitioner because she did not have a collaborative agreement as required by law. His statement that he would nevertheless employ her to care for his own family as a nurse is, in the court's view, a positive, not negative reference.

The evidence concerning Dr. Raba's communication with Hunter Enterprises is more troubling, but it also does not establish that Plaintiff suffered an adverse employment action. It is undisputed that the employment reference form that Cerna completed in her telephone conversation with Dr. Raba was not conveyed to prospective employers, (Def. 56.1(a) ¶ 59), and Plaintiff acknowledged that she is unaware of any prospective employers who refused to hire her based on any information received from Hunter Resources. (Szymanski Dep., at 129.) Plaintiff emphasizes Dr. Raba's testimony that he would not have made any comments relative to Plaintiff's termination to the Hunter Enterprises interviewer, had he been aware of the court order directing that references to Plaintiff's termination be expunged. (Pl.'s Brief, at 10.) Cook County's failure to abide by Judge Coar's order is disappointing, but Plaintiff has offered no evidence that Dr. Raba's comments to Hunter Enterprises adversely affected her. The court agrees with Defendant that there is no evidence in the record that any prospective employer relied on statements made by Dr. Raba to Hunter Enterprises to her detriment. Thus, Plaintiff has not suffered an adverse employment action. (Def.'s Brief, at 4.)

Having concluded that the evidence is insufficient to establish discrimination under the direct method of proof, the court considers whether there is a dispute of fact under the indirect method. Under that method, as set forth in *Stone v. City of Indianapolis* and its progeny, an employee may establish a *prima facie* case of retaliation by showing that "after filing the charge only [s]he, and not any similarly situated employee who did not file a charge, was subjected to an adverse

19

employment action," *Hasan v. U.S. Dept. of Labor*, 400 F.3d 1001, 1004 (7th Cir.2005), citing *Stone*; *see also Koszola v. Board of Education*, 385 F.3d 1104, 1110 (7th Cir.2004). The court specifically declined to impose a requirement that plaintiff also prove a causal link between the protected activity and the adverse employment action. 281 F.3d at 754-755 (citing *Miller v. American Family Mutual Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000)).

Even without such a requirement, the court concludes Plaintiff has not established a *prima facie* case of retaliation under the indirect method, either. As described above, she has presented evidence of the first prong, that she filed a charge, and the third prong, that she was subjected to an adverse employment action. There is no evidence, however, that Plaintiff, "and not any otherwise similarly situated employee who did not complain was . . . subjected to an adverse employment action." *Id.* at 642. A similarly situated employee is one who is "directly comparable to [the plaintiff] in all material respects." *Rogers,* 320 F.3d at 755 (citing *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002)).

Plaintiff has presented no evidence about similarly situated employees who did not file discrimination charges. In a previous opinion, Judge Coar noted that besides Szymanski, two other nurse practitioners had been suspended or terminated for not having a collaborative agreement. *Szymanski,* 2002 WL 31509780, at *5. Yet Plaintiff has presented no evidence concerning the employment references furnished for these other nurse practitioners, or for other nurses who left the employ of Cook County. The analysis ends here; "when plaintiffs proceeding under the burden-shifting formula of *McDonnell Douglas* cannot produce competent evidence that they were treated differently than similarly situated employees," the employer is entitled to summary judgment. *Stone,* 281 F.3d at 756. Because this court finds there are no issues of genuine material fact regarding

whether Defendant retaliated against Szymanski by providing negative employment references, Defendant's motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

## II. Interference with Prospective Economic Advantage

Plaintiff does not mention interference with prospective economic advantage (Count II) in her motion for summary judgment, nor has she responded to Defendant's motion for summary judgment on that claim. The court concludes that summary judgment on this count is appropriate.

Under Illinois law, the essential elements of interference with prospective economic advantage are (1) the plaintiff's reasonable expectation of entering into a valid business relationship; (2) the defendant's knowledge of the plaintiff's expectancy; (3) purposeful interference by the defendant that prevents plaintiff's legitimate expectancy from being fulfilled; and (4) damages to the plaintiff resulting from the defendant's interference. *Anderson v. Vanden Dorpel*, 172 Ill.2d 399, 406-07, 667 N.E.2d 1296, 1299 (1996). The *Anderson* court explained that, for purposes of this tort claim, "[t]he hope of receiving a job offer is not a sufficient expectancy." *Id.* at 408, 667 N.E.2d at 1299. Even if such a hope were sufficient, the court notes that Plaintiff has not established that any of her prospective employers declined to extend an offer based upon statements made by Dr. Raba or any other Cook County official. Plaintiff has been employed as a nurse with the Little Company of Mary Hospital since soon after her termination from Cook County. The two nursing placement services to which she applied for work responded favorably to her application. Plaintiff was not hired by the University of Chicago Hospitals, but she has offered no admissible evidence that Dr. Raba, or any other member of the Cook County staff, purposefully interfered with her employment application. In addressing a motion for summary judgment, this court is entitled to rely "on the

21

nonmoving party to identify with reasonable particularity the evidence upon which he relies." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996). In light of Plaintiff's failure to address this claim in her own moving papers or her response to Defendant's, the court grants summary judgment in favor of Defendant on Count II, as well.

## CONCLUSION

For the reasons explained above, Plaintiff's motion for summary judgment (Docket No. 15) is denied in its entirety and Defendant's motion for summary judgment (Docket No. 17) is granted in its entirety.

ENTER:

Dated:     December 9, 2005

REBECCA R. PALLMEYER
United States District Judge